```
                DISTRICT COURT OF THE VIRGIN ISLANDS
                 DIVISION OF ST. THOMAS AND ST. JOHN

UNITED STATES OF AMERICA,            )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )   Civil No. 2011-69
                                     )
VICTOR ROMERO-REYES,                 )
                                     )
          Defendant.                 )
                                     )
```

ATTORNEYS:

**Hans Harris Chen, Trial Attorney**
United States Department of Justice, Office of Immigration
Litigation
Washington, D.C.
**Ronald W. Sharpe, United States Attorney**
**Jason T. Cohen, AUSA**
United States Attorney's Office
St. Thomas, VI
   *For the plaintiff,*

**Alan R. Feuerstein, Esq.**
Feuerstein & Smith, LLP
Buffalo, NY
   *For the defendant.*

## MEMORANDUM OPINION

GÓMEZ, C.J.

   This is an action to revoke and set aside the citizenship of the defendant. Presently before the Court is the motion of the plaintiff for summary judgment. The defendant opposes the motion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The defendant, Victor Romero-Reyes ("Romero-Reyes"), is a native of the Dominican Republic. He became a lawful permanent resident alien of the United States of America (the "United States") on October 13, 1988.

In or about 1997, Romero-Reyes filed an application for naturalization with the former Immigration and Naturalization Service ("INS"). The basis of Romero-Reyes's application was his status as a legal permanent resident for at least five years, in accordance with Title 8, Section 1427(a) of the United States Code.

On December 9, 1997, and again on April 14, 1998, Romero-Reyes appeared before INS officers to determine his eligibility for citizenship. On June 2, 1999, his application for citizenship was denied. In a letter announcing the INS's determination, INS Officer Ronald C. Parra explained that Romero-Reyes's application was denied because he "failed to demonstrate [his] ability to read and write in the English language and the required knowledge of the principles and form of government and history of the United States. You failed to meet the requirement [*sic*] at interviews on December 9, 1997, and April 14, 1998." (Def.'s Ex. 4 (emphasis original)).

On June 9, 1999, Romero-Reyes again filed an application for naturalization, submitting INS Form N-400 ("N-400"). (Pl.'s

Ex. A, N-400; Ex. B Nos. 8-9; Ex. I, Tr. of Romero-Reyes Dep. 47:11-13 [hereinafter Romero-Reyes Dep.].) On his N-400, Romero-Reyes answered "no" to Question 15(a) of Part 7 ("Question 15(a)"), which asked, "Have you ever[] . . . knowingly committed any crime for which you have not been arrested?" (Ex. A.)

Both the questions posed by the N-400 as well as Romero-Reyes's answers were written in English. The N-400 was not prepared by Romero-Reyes himself, but by a third party, Arturo Soto ("Soto"). At the end of the form, Soto signed a declaration that he "prepared this application at the request of [Romero-Reyes] and it is based on all information of which I have knowledge." Romero-Reyes also signed the N-400, beneath the words "I certify . . . under penalty of perjury . . . that this application . . . is all true and correct." (Ex. A.)

On March 22, 2000, Romero-Reyes appeared before INS Officer Lorelie Conner ("Officer Conner") to determine his eligibility for naturalization. During the interview, Officer Conner asked Romero-Reyes Question 15(a). She indicated with a red slash through a box marked "no" that Romero-Reyes answered Question 15(a) in the negative. Immediately above Question 15(a) she also wrote, "Claims never been arrested anywhere." (Ex. A.; *see also* Romero-Reyes Dep. 49:22-50:4, 50:11-15 (stating that Conner asked him Question 15(a)).) Conner conducted the interview in English. (Romero-Reyes Dep. 50:18-25.)

On June 13, 2000, Romero-Reyes's naturalization application was approved. Thereafter, the INS mailed Romero-Reyes a Notice of Naturalization Oath Ceremony, Form N-445 ("Form N-445"). The N-445 advised Romero-Reyes that he was scheduled to take his oath of allegiance on August 25, 2000. The N-445 also required Romero-Reyes to answer certain additional questions. Specifically, Question 3 of the N-445 asked if Romero-Reyes had "knowingly committed any crime or offense, for which [he had] not been arrested" since the date of his naturalization interview. Question 7 of the N-445 asked if Romero-Reyes had "illicitly trafficked in drugs or marihuana" since the date of his naturalization interview. (Ex. P., N-445.) Romero-Reyes answered "no" to both these questions. He also signed the N-445 below the words "I certify that each of the answers shown above were made by me or at my direction, and that they are true and correct." (Ex. P.)

Based on his N-400; his March 22, 2000, interview; and his N-445, the INS permitted Romero-Reyes to be naturalized upon his taking of the oath of allegiance on August 25, 2000. The INS issued Romero-Reyes Certificate of Naturalization No. 24453741.

On June 18, 2002, Romero-Reyes was arrested by agents of the Federal Bureau of Investigation for allegedly

participating in a conspiracy to smuggle cocaine into Puerto Rico. (Ex. E at 2.)

On July 10, 2002, a federal grand jury returned an indictment against Romero-Reyes (the "Indictment"). (Ex. F., Indictment). The sole count of the Indictment charged that,

> From on or about February 14, 2000, through March 23, 2000, . . .
>
> **VICTOR ROMERO-REYES . . . ,**
>
> . . . aided and abetted by other persons known and unknown . . . attempted to commit an offense defined in Title 21, United States Code, Section 952(a), that is, to import into the United States from a place outside thereof more than five (5) kilograms of cocaine, a Schedule II Controlled Substance, all in violation of Title 21, United States Code Section 963.

(Ex. F.)

On December 12, 2002, Romero-Reyes signed a plea agreement (the "Plea Agreement") in which he agreed to plead guilty to the Indictment. The Plea Agreement contained a Stipulation of Facts, which stated that

> 1. Beginning in February 2000, VICTOR ROMERO-REYES combined and agreed with others to smuggle cocaine into Puerto Rico. Towards [*sic*] this end, the conspirators acquired a speed boat outfitted for smuggling, and

> asked a Confidential Source of Information ("CS") to transport this boat from Puerto Rico to St. Maarten, Netherlands Antilles.
>
> 2. The CS apprised the FBI of this request and, at the direction of the FBI, complied with this request. Specifically, on February 16, 2000, the CS received a white speed boat . . . from defendant's confederates in Puerto Rico. The CS transported this vessel to St. Thomas, U.S. Virgin Islands, and a few days later this boat was delivered to Saint Maarten to other conspirators [*sic*].
>
> 3. On March 23, 2000, aircraft and vessels of the United States Coast Guard and the United States Customs Service detected and detained this same speed boat as it was approaching the northern coast of Puerto Rico. The boat was seized and its three-man crew . . . was arrested when law enforcement agents discovered it was carrying 26 bales of cocaine.

(Pl.'s Ex. D at 11.) Notwithstanding this Stipulation of Facts, the United States agreed that Romero-Reyes was accountable for only three kilograms of cocaine. Romero-Reyes and his counsel signed the Plea Agreement, and each separately signed the Stipulation of Facts.

On December 16, 2002, Romero-Reyes appeared before the District Court of the District of Puerto Rico at a Change

of Plea Hearing. An interpreter was present and interpreted the proceedings for Romero-Reyes. (Pl.'s Ex. J., Tr. of Change of Plea Hearing).

The district court first inquired whether Romero-Reyes had had the plea agreement explained to him by his attorney in Spanish, to which Romero-Reyes responded he had. The district court then read from the Indictment, and Romero-Reyes stated that he had committed the acts described therein. The district court also asked Romero-Reyes, "Are you repentant of having committed this offense?" to which Romero-Reyes replied, "Yes, a lot." (Pl.'s Ex. J at 16.)

The district court then asked the United States to recite what facts it would have proven had the case proceeded to trial. The United States stated:

> [B]eginning in February 2000, this defendant combined and conspired with others to smuggle cocaine into Puerto Rico, and towards [sic] this end the conspirators acquired a speedboat outfitted for smuggling and asked a confidential source of information to transport this boat from Puerto Rico to St. Martin [sic] in the Netherland Antilles.

(Ex. J. at 26.) The district court then asked Romero-Reyes "do you agree with the government's version that you just

heard?" Romero-Reyes answered "Yes. . . . I spoke with someone and I did have something to do with that person." (Ex. J. at 27.) Thereafter the district court accepted Romero-Reyes's plea of guilty and convicted him of violating Title 21, Section 963 of the United States Code, as charged in the Indictment. The court then ordered the United States Probation Office to prepare a presentence report. (Pl.'s Ex. J. at 28.)

On January 27, 2003, a United States Probation Officer interviewed Romero-Reyes to prepare the presentence report. When asked about the crime, Romero-Reyes admitted that he had been paid $3,000 for his participation in obtaining a boat for the purposes of smuggling cocaine. (Ex. E, Presentence Report, at 2.) Romero-Reyes did not make any objection to the presentence report.

On April 21, 2003, Romero-Reyes was sentenced to forty-six months incarceration and four years of supervised release. (Pl.'s Ex. L, Judgment.)

On May 5, 2003, Romero-Reyes appealed his conviction, arguing in part that his trial counsel had rendered ineffective assistance. The Court of Appeals for the First

Circuit rejected that argument, and affirmed Romero-Reyes's conviction on July 1, 2004.

On June 21, 2011, the United States initiated this action to revoke and set aside the order admitting Romero-Reyes to citizenship and to cancel his certificate of naturalization pursuant to Title 8, Section 1451(a), of the United States Code. Its complaint sets forth four counts. Count One asserts that Romero-Reyes's citizenship should be revoked because he lacked good moral character when he applied for citizenship, because he aided and abetted narcotics trafficking. Count Two asserts that Romero-Reyes further lacked good moral character because he lied about his involvement in the narcotics trafficking during the naturalization application process. Count Three asserts that he further lacked good moral character because aiding and abetting in narcotics trafficking is a crime of moral turpitude. Count Four asserts that Romero-Reyes's citizenship should be revoked because he willfully misrepresented or concealed his criminal history during the naturalization proceedings.

The United States now moves for summary judgment on all counts. Romero-Reyes has submitted a timely opposition.

## II.  DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir. 1986).

The movant has the initial burden of showing there is no genuine issue of material fact, but once this burden is met it shifts to the non-moving party to establish specific facts showing there is a genuine issue for trial. *Gans v. Mundy*, 762 F.2d 338, 342 (3d Cir. 1985). The non-moving party "may not rest upon mere allegations, general denials, or . . . vague statements." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* In making this determination, this Court draws all reasonable inferences in favor of the opposing party. *See Bd. of Educ. v. Earls*, 536 U.S. 822, 850 (2002); *see also Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994).

### III. ANALYSIS

"The Immigration and Naturalization Act of 1952, 8 U.S.C. § 1451(a), requires the revocation of United States citizenship that was illegally procured." *United States v. Geiser*, 527 F.3d 288, 291 (3d Cir. 2008) (quoting *Fedorenko v. United States*, 449 U.S. 490, 493 (1981)) (internal quotation marks omitted). "[T]here must be 'strict compliance' with all the congressionally imposed prerequisites to naturalization, and failure to comply with any of these terms renders the naturalization illegally procured and subject to revocation . . . ." *United States v. Breyer*, 41 F.3d 884, 889 (3d Cir. 1994) (quoting *Fedorenko*, 449 U.S. at 506). The legality of a naturalization "ultimately turns on" an alien's eligibility under the statute through which a visa was issued. *United States v. Szehinskyj (Szehinky I)*, 277 F.3d 331, 334 (3d Cir. 2002).

Here, Romero-Reyes was naturalized pursuant to Title 8, Section 1427(a) of the United States Code ("Section 1427(a)"). Section 1427(a) provides, in pertinent part:

> No person . . . shall be naturalized unless such applicant, (1) immediately preceding the date of filing his application for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years . . . (2) has resided continuously in within the United States from the date of the application up to the

> time of admission of citizenship, and (3) during all the period referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.

8 U.S.C. § 1427(a). Here, the United States does not dispute that Romero-Reyes became a legal permanent resident on October 13, 1988, and has resided continuously in the United States ever since. Instead, it argues that, by participating in a drug-trafficking scheme, Romero-Reyes was not a person of good moral character.

A person lacks good moral character if, within the statutory period, that person committed an offense that would ordinarily render an alien inadmissible or deportable, and is subsequently convicted of that offense. *See* 8 U.S.C. § 1101(f)(3) (providing that a person does not have good moral character if that person has committed the offenses described in Title 8, Section 1182 of the United States Code) ("Section 1101(f)(3)"). These offenses include "a crime of moral turpitude" or "a violation of . . . any law or regulation of . . . the United States . . . relating to a controlled substance." 8 U.S.C. § 1182(a)(2)(A)(i). Cocaine is a controlled substance. 21 U.S.C. § 802(17)(C)-(D).

In support of its motion for summary judgment, the United States offers a copy of Romero-Reyes's plea agreement and his

conviction. (Pl.'s Ex. D; Ex. J.; Ex. K, Judgment.) Romero-Reyes was convicted of violating Title 21, Section 963 of the United States Code, which prohibits the aiding or abetting of the importation of cocaine into the United States. The plea agreement indicates that the offense began in or about February, 2000, and the judgment indicates that the offense concluded on or about March 23, 2000. (Pl.'s Ex. D; Ex. K.) This date range falls after Romero-Reyes submitted his application for naturalization, but before he was admitted to citizenship. The evidence submitted on the record is sufficient to show that Romero-Reyes committed an offense against the laws of the United States involving a controlled substance during the statutory period, and that he was subsequently convicted of this offense. Thus, the United States has discharged its burden to show that it is entitled to judgment as a matter of law.

The burden now shifts to Romero-Reyes to show there is a genuine dispute of material fact. To that end, Romero-Reyes first argues that the United States did not "know" Romero-Reyes was involved in the drug-smuggling scheme until after August 25, 2000, when he was admitted to citizenship. (Opp. to Mot. for Summ. J. 10.)

That argument is deficient for several reasons. First, when the United States became aware of Romero-Reyes's criminal conduct is immaterial. There is no requirement in any statute or

in the relevant decisional law that the United States be aware (whatever that may mean) of the criminal conduct at the time it occurs; only that the person have committed the conduct during the statutory period. *See Szehinskyj*, 277 F.3d 331, 335 (holding that all that is required for a determination that citizenship was illegally procured under Section 1427(a) is a finding that the alien was ineligible at the time the application for citizenship was made).

Romero-Reyes next argues that "he did not *knowingly* act, aid and abet a dru[g] trafficking conspiracy." (Opp. to Mot. for Summ J. 8.) Romero-Reyes claims that he did not fully understand the plea agreement, due to his lack of facility with the English language,[1] and did not believe he was doing anything wrong when he procured the boat that was later used in an attempt to smuggle cocaine into Puerto Rico. This argument is similarly unavailing. Section 1101(f)(3) does not require the knowing commission of any offense for a person to lack good moral character. It requires only that the offense have been committed during the statutory period and that the person be subsequently convicted of it.

---

[1] This argument is belied somewhat by the fact that Romero-Reyes was judged sufficiently familiar with English to become a citizen, after having been previously rejected in part for his lack of English facility.

To the extent that Romero-Reyes denies having committed an offense at all, the doctrine of collateral estoppel precludes him from doing so. "Where . . . a conviction is the result of a guilty plea, its preclusive effect extends to all issues that are necessarily admitted in the plea." *Anderson v. Comm'r*, No. 11-1704, 2012 WL 3871584, at *3 (3d Cir. Sept. 7, 2012) (slip opinion). As part of his guilty plea, Romero-Reyes admitted that he helped obtain a boat, which was to be used to smuggle drugs into Puerto Rico. (Pl.'s Ex. D.) Having made a voluntary and knowing guilty plea, Romero-Reyes is estopped from denying the facts he admitted therein, including his participation in a drug-trafficking offense in or about February, 2000. *See Anderson v. Comm'r*, No. 11-1704, 2012 WL 3871584, at *3 (3d Cir. Sept. 7, 2012) (slip opinion).

Romero-Reyes appears to further argue that his guilty plea was not truly knowing. In particular, he claims that his counsel failed to fully explain the consequences of his plea, and that he pleaded guilty despite believing he did nothing wrong. While this may be a valid basis for petitioning for some sort of post-conviction relief, this action is not the appropriate avenue for such a collateral attack on his conviction. The Court is unaware of, and Romero-Reyes does not identify, any authority for the proposition that the Court, in a Section 1427(a) action, is authorized to sit as a *de facto* court of habeas corpus over the

court in which he was convicted. Moreover, the Court notes that Romero-Reyes has previously raised the issue of effective assistance of counsel before the Court of Appeals for the First Circuit, and that argument was then rejected.

Accordingly, as there is no genuine dispute of material fact, the United States is entitled to judgment as a matter of law. An appropriate judgment follows.[2]

S_____<br>
**Curtis V. Gómez**<br>
**Chief Judge**

---

[2] Having found Romero-Reyes's conviction a sufficient basis for revocation, the Court declines to address the United States' alternative position that he should be denaturalized for willfully misrepresenting his criminal conduct during the application process.